

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

CHERISHA LOVEJOY, an individual, on behalf of herself and all others similarly situated,

Plaintiff,

v.

TRANSDEV SERVICES, INC., et al.,

Defendants.

Case No.:  23-cv-00380-AJB-MMP

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**(Doc. No. 46)**

Presently before the Court is Plaintiff Cherisha Lovejoy's ("Plaintiff") motion for class certification. (Doc. No. 46.) Defendant Transdev Services, Inc. ("Defendant") filed an opposition (Doc. No. 58), to which Plaintiff replied (Doc. No. 59). For the reasons set forth below, the Court **GRANTS in part and DENIES in part** Plaintiff's motion.

## I.    FACTUAL BACKGROUND

The instant class action centers on allegations that Defendant "systematic[ally] mistreat[ed] its employees in violation of California's wage and hour laws." (Doc. No. 1, Complaint ("Compl."), ¶ 1.) As "the largest private operator of multiple modes of public transportation in the United States," Defendant "contracts with municipal transportation authorities to operate buses and trains." (Doc. No. 46-1 at 8–9; *see* Compl. ¶ 1.) Plaintiff

1

was employed by Defendant as a non-exempt hourly bus operator fulfilling Defendant's contract with San Diego Metropolitan Transit System from August 2018 through December 2021. (Doc. No. 46-1 at 8; Compl. ¶¶ 1, 7.)

Throughout the proposed class period, Defendant has used the "HASTUS run cutting system" to generate route schedules called "paddles." (Doc. No. 50 at 30–82, Deposition of Andrew Krueger ("Krueger Dep."), at 37–38, 44–45; *see also* Doc. No. 46-1 at 9–14; Compl. ¶ 2.) Paddles are then imported into Defendant's "in-house time and attendance system"—the Veolia Dispatch System ("VDS"). (Doc. No. 50 at 17–28, Deposition of Donna Diaz, at 19; Krueger Dep. at 38; Doc. No. 46-1 at 9.) Then, if no additional action is taken, the operators are paid for the hours reflected on the paddle. (*See* Doc. No. 46-1 at 9–14; Krueger Dep. at 78; Compl. ¶¶ 2, 8.) If a dispatcher observes or is alerted to a discrepancy between the paddle and reality (such as an operator checking in late, calling to report missing a meal break, or submitting an exception form), the dispatcher is supposed to modify the scheduled time to reflect the actual time. (Doc. No. 46-1 at 9; Krueger Dep. at 61–63.)

Plaintiff argues that the paddles are "aspirational" "estimates of what hours [operators] should have worked in an idealized situation[]," and the practical realities operators encounter result in having to "work[] unpaid time before and after the preset 'theoretical' paddle time; having scheduled meal breaks on paddles be deducted from time worked even though Class members are often forced to miss or be late to their meal breaks; missing rest breaks altogether; not being paid meal and rest break premiums; and not being paid split shift premiums." (Doc. No. 46-1 at 9; Compl. ¶¶ 2, 8.) As such, Plaintiff asserts that this system of "pre-load[ing]" the "'theoretical time' each bus driver is estimated to work" into VDS results in Defendant "systematically fail[ing] to record actual time worked and compensate its bus drivers/operators, including Lovejoy, for all hours." (Doc. No. 46-1 at 8–9; *see generally* Compl.)

///

///

23-cv-00380-AJB-MMP

## II.    LEGAL STANDARD

Class actions are the "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). "To certify a class, plaintiffs bear the burden of satisfying each of the four requirements of Federal Rule of Civil Procedure 23(a)—numerosity, commonality, typicality, and adequacy—and at least one requirement of Rule 23(b)."[1] *Small v. Allianz Life Ins. Co. of N. Am.*, 122 F.4th 1182, 1197 (9th Cir. 2024). "To make their required showing, plaintiffs 'must actually *prove*— not simply plead—that their proposed class satisfies each requirement of Rule 23 . . . .'" *White v. Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1192 (9th Cir. 2024) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014)).

Under Rule 23(a), a case is appropriate for certification as a class action if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). The Rule 23(a) requirements "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (*General Tel. Co. v. Falcon*, 457 U.S. 147, 156 (1982)).

"In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3). *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Relevant here, pursuant to Rule 23(b)(3), "[a] class action may be maintained if Rule 23(a) is satisfied and if . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other

---

[1]    All further references to Rule or Rules are to the Federal Rules of Civil Procedure unless otherwise stated.

available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Because "[c]lass certification is . . . not to be granted lightly[,] . . . Rule 23 mandates that district courts 'rigorous[ly] analy[ze]' whether a proposed class meets various requirements." *Black Lives Matter L.A. v. City of L.A.*, 113 F.4th 1249, 1258 (9th Cir. 2024) (quoting *Comcast*, 569 U.S. at 33) (alterations in original).

## III.  DISCUSSION

Plaintiff seeks to certify the following class:

> All current and former Bus Driver/Operator employees of Transdev Services, Inc. who drove routes with stops in California during the period from February 27, 2019 through the present ("Class Period").

(Doc. No. 46-1 at 15; *see also* Compl. ¶¶ 59, 60(v).) Excluded from the putative class are "any of Defendant's officers, directors, legal representatives, heirs, successors, or assigns, and any entity in which Transdev has a controlling interest." (Doc. No. 46-1 at 15.) Plaintiff also moves the Court for an order appointing her as class representative and appointing Hewgill Cobb & Lockard, APC and Schonbrun Seplow Harris Hoffman & Zeldes, LLP as class counsel. (*Id.* at 32.)

Defendant asserts Plaintiff's motion fails because individualized issues preclude a finding of commonality and predominance. (*See* Doc. No. 58.) The Court will address each requirement of Rule 23 in turn.

### A.  Proposed Class Definition

In opposing Plaintiff's motion for class certification, Defendant asserts that Plaintiff's class "can include drivers who operate in interstate commerce" and therefore would be subject to federal regulation rather than that of California. (Doc. No. 58 at 11–12.) In reply, Plaintiff states that the claims are brought on behalf of "a California-only class of drivers, who are clearly municipal bus drivers, not interstate drivers." (Doc. No. 59 at 12.) Moreover, Plaintiff asserts that "Transdev knows that these drivers' routes do not cross state lines (their schedules alone readily establish this fact)[.]" (*Id.*) As such,

Plaintiff invites the Court to modify the current definition to eliminate such alleged ambiguity by adding "California" before "Bus Driver/Operator employees." (*Id.*)

District courts have the inherent power to modify class definitions. *See Mazur v. eBay Inc.*, 257 F.R.D. 563, 568 (N.D. Cal. 2009) (citing *Hagen v. City of Winnemucca*, 108 F.R.D. 61, 64 (D. Nev. 1985)); *see also Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) ("[D]istrict courts have broad discretion to modify class definitions . . . ."); *Schorsch v. Hewlett–Packard Co.*, 417 F.3d 748, 750 (7th Cir. 2005) (noting that "[l]itigants and judges regularly modify class definitions"). Using this discretion, the Court **MODIFIES** the class definition as stated by Plaintiff in her reply for class certification, restricting the Bus Driver/Operator employees to those exclusively in California as follows:

> All current and former **California** Bus Driver/Operator employees of Transdev Services, Inc. who drove routes with stops in California during the period from February 27, 2019 through the present ("Class Period").

(*See* Doc. Nos. 46-1 at 15; 59 at 12; *see also* Compl. ¶¶ 59, 60(v).)

### B.    Numerosity, Typicality, and Adequacy

The Court will first start with an analysis of whether Plaintiff has satisfied the Rule 23(a) prerequisites not in contention: numerosity, typicality, and adequacy. (*See generally* Doc. No. 58.)

### 1.    Numerosity

First, the numerosity requirement is satisfied where "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[I]mpracticability does not mean impossibility, but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Ests., Inc.*, 329 F.2d 909, 913–14 (9th Cir. 1964) (citation omitted). "While there is no strict number requirement for numerosity, courts have routinely held that classes comprised of more than forty members will satisfy this prerequisite." *Martin v. Sysco Corp.*, 325 F.R.D. 343, 348 (E.D. Cal. 2018) (collecting cases).

///

Here, Plaintiff asserts the class is sufficiently numerous because the proposed class includes 4,966 potential members. (Doc. No. 46-1 at 16.) As the potential class is in the thousands, the Court find this requirement is satisfied. *See, e.g.*, *Meek v. SkyWest, Inc.*, 562 F. Supp. 3d 488, 493 (N.D. Cal. 2021) (finding numerosity where the proposed class exceeded 1,700 employees and the element was unopposed).

### 2.    Typicality

Rule 23(a)(3)'s typicality requirement provides that "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Falcon*, 457 U.S. at 156 (quoting *E. Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)) (internal quotation marks omitted); *see also Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) ("[T]ypicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought.") (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). The purpose of the requirement is "to assure that the interest of the named representative aligns with the interests of the class." *Hanon*, 976 F.2d at 508.

Plaintiff asserts typicality is satisfied because she and the putative class members worked as bus drivers for Defendant during the class period and suffered the same injury from Defendant's "common" and "systematic[]" course of conduct. (Doc. No. 46-1 at 18.) Defendant does not contest this element. (*See generally* Doc. No. 58.) The Court finds Plaintiff's injuries are "reasonably co-extensive with those of absent class members" such that her claim, injury, and interest are typical of the class and, as such, that Plaintiff has satisfied the typicality requirement. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010).

### 3.    Adequacy

Rule 23(a)(4) requires the class representative to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To determine whether the representation meets this standard, we ask two questions: (1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the

representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). "Adequacy of representation also depends on the qualifications of counsel." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1007 (9th Cir. 2018). Specifically, "[t]he named representative's attorney must be qualified, experienced, and generally capable to conduct the litigation." *Id.* (quoting *Jordan v. L.A. Cnty.*, 669 F.2d 1311, 1323 (9th Cir. 1982)) (cleaned up).

Plaintiff asserts she "has no antagonistic or conflicting interest with the members of the proposed Class" and "has demonstrated her commitment to the Class by actively participating in the litigation." (Doc. No. 46-1 at 19.) For instance, Plaintiff "worked with counsel to develop her claims, regularly communicates with counsel, and generally stays apprised of the progress of the litigation." (*Id.*) Additionally, counsel assert they are experienced in wage and hour class actions and will continue to vigorously prosecute the class claims, as they have done thus far. (*Id.*) In support of these assertions, class counsel proffered declarations from the two firms representing Plaintiff detailing actions taken litigating this case. (*See* Doc. Nos. 46-2; 63.)

Based on the assertions made by Plaintiff and her counsel, the Court is satisfied that Plaintiff's interests align with those of the proposed class members, that both Plaintiff and counsel have and will continue to vigorously prosecute the action on behalf of the putative class, and that no conflicts exist. Accordingly, the Court finds Plaintiff has met her burden of demonstrating the adequacy requirement.

## C.  Commonality and Predominance

The Court next turns to the contested Rule 23 requirements: commonality and predominance.

"The commonality and predominance inquiries overlap." *White*, 104 F.4th at 1191. Commonality requires the plaintiffs' claims to "depend upon a common contention" that "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. 338 at 350. "What matters to class certification is not the raising of

common questions—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (cleaned up). "Rule 23(b)(3), in turn, requires that these common questions predominate over individual ones." *White*, 104 F.4th at 1192. "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

### 1.    Off-the-Clock, Overtime, and Double-Time Claim

Plaintiff's first cause of action alleges that Defendant fails to pay all regular, minimum, and overtime wages. (Compl. ¶¶ 68–80.) Plaintiff's off-the-clock claims are based on the assertion that Defendant pays the putative class for scheduled time, not actual time. (Compl. ¶¶ 27–31, 77, 79.) As a result, drivers are not paid for their time if routes take longer than expected, if they arrive to work early to complete the precheck due to it taking longer than scheduled, or if they need to fill out exception forms. (*Id.*) Next, if the putative class were credited for that time, Plaintiff asserts they would work an excess of eight hours per day and/or forty hours per week, thus qualifying for overtime or double time. (Compl. ¶¶ 32–33, 76, 78; Doc. No. 46-1 at 20–22.)

In the instant motion, Plaintiff further asserts that this cause of action includes the common questions of "whether Transdev pays bus driver employees based on paddle times rather than actual time worked, resulting in underpayment," "whether Transdev's automatic deduction of 30-minute meal breaks from time records results in bus drivers being underpaid," and "whether Transdev systematically fails to compensate drivers for all hours worked as a result of its policy to pre-load its timekeeping system with paddle times." (Doc. No. 46-1 at 16–17.)

///

///

///

In California, any hours worked[2] in excess of eight hours a day, six days a week, or forty hours a week must be compensated at a "rate of no less than one and one-half times the regular rate of pay for an employee." Cal. Lab. Code § 510(a); *see also* Cal. Code Regs. tit. 8, § 11090(3)(A)(1)(a). "Any work in excess of 12 hours in one day" or "in excess of eight hours on any seventh day of a workweek" is to be "compensated at the rate of no less than twice the regular rate of pay for an employee." Cal. Lab. Code § 510(a); *see also* Cal. Code Regs. tit. 8, § 11090(3)(A)(1)(b). "A plaintiff may establish liability for an off-the-clock claim by proving that (1) he performed work for which he did not receive compensation; (2) that defendants knew or should have known that plaintiff did so; but that (3) the defendants stood idly by." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014) (cleaned up).

In support of the off-the-clock claims, Plaintiff proffers declarations of herself and eighteen additional current and former employees. (*See* Doc. Nos. 46-3; 46-4.) Employees assert the schedules provided between 10–15 minutes to conduct the required pre-check, but that the pre-checks took between 20–30 minutes to complete. (*See* Doc. Nos. 46-4 at 72–76, Declaration of Trinidad Aguilera, "Aguilera Decl.", ¶ 5 ("Transdev only paid 15 minutes for pre-trip check" which "took 20–25 minutes, on a good day"); 46-3, Declaration of Cherisha Lovejoy, "Lovejoy Decl.", ¶ 4 ("Transdev only assigned 15 minutes of paid time for doing a pre-trip check," a "process [that] took at least 20–25 minutes, assuming there was no issue with any of the items we were required to check on the bus."); 46-4 at 12–15, Declaration of Billy Joe LaPlant, "LaPlant Decl.", ¶ 5 (same); 46-4 at 3–7, Declaration of Alea Garza, "Garza Decl.", ¶ 5 ("Transdev only paid us 10 minutes for our pre-trip check of our buses. That process took at least 20 minutes, assuming there was nothing wrong with the bus."); 46-4 at 52–55, Declaration of Mike Molleson, "Molleson

---

[2]      "'Hours worked' means the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." Cal. Code Regs. tit. 8, § 11090(2)(G).

Decl.", ¶ 4 ("Transdev only paid us 15 minutes to our pre-trip check" which "took much longer than that" so "I would typically start 20–30 minutes before my start time.").)

Employees averred that they were told they could not receive an exception if the pre-check took longer than planned. (Doc. Nos. 46-4 at 16–19, Declaration of Charles Fletcher, "Fletcher Decl.", ¶ 7 ("I was not able to have dispatch add time for me because I was told that I could not do an exception for it taking longer to get my bus ready, or to get to my bus on the route."); 46-4 at 20–23, Declaration of Christian Flores, "Flores Decl.", ¶ 13 (same); 46-4 at 24–27, Declaration of Daniel Bourque, "Bourque Decl.", ¶ 6 (same); 46-4 at 36–39, Declaration of Javier Rodriguez, "Rodriguez Decl.", ¶ 6 (same); 46-4 at 40–43, Declaration of Kirsten Cook, "Cook Decl.", ¶ 6 (same); 46-4 at 44–47, Declaration of Lorraine Dominguez, "Dominguez Decl.", ¶ 13 (same); 46-4 at 60–63, Declaration of Sky Moore, "Moore Decl.", ¶ 6 (same); 46-4 at 64–67, Declaration of Tammy Murillo, "Murillo Decl.", ¶ 6 (same); 46-4 at 68–71, Declaration of Theodore Anthony Brazelton, "Brazelton Decl.", ¶ 6 (same).) Additionally, if the bus was late getting on to its route, the driver would be written up, reprimanded, and potentially fired. (*See* Aguilera Decl. ¶ 5 ("[I]f a driver was late getting out on the route we would get written up, and could be fired if we were written up for this multiple times in a year."); Lovejoy Decl. ¶ 4 ("Drivers, including myself, did this because if we did not complete our pre-check and get on route at the time the paddle called for, we would be reprimanded."); LaPlant Decl. ¶ 5 (same); Garza Decl. ¶ 5 ("[I]f drivers (including myself) were late getting out on route we would be written up, and could be fired.").)

To prevent being reprimanded, employees generally averred that they came in early to work to complete the pre-check or to be transported to a bus already en route. (*See* Lovejoy Decl. ¶ 4; Aguilera Decl. ¶ 5; Flores Decl. ¶ 5; LaPlant Decl. ¶ 5; Garza Decl. ¶ 5; Molleson Decl. ¶ 4; Doc. Nos. 46-4 at 8–11, Declaration of Ben Puente, "Puente Decl.", ¶ 5; 46-4 at 28–31, Declaration of Jamar Smith, "Smith Decl.", ¶ 5; 46-4 at 56–59, Declaration of Pamela Jordan, "Jordan Decl.", ¶ 5.) In fact, some employees asserted that they were expressly told to do the pre-check prior to clocking in. (*See* Molleson Decl. ¶ 4

("Dispatch workers would tell me to go do pre-check and then come back and clock in at my arrival time, or they would offer to clock me in at my arrival time for me."); Dominguez Decl. ¶ 6 ("Before letting me sign in dispatch would make me and other bus drivers do pre check, move bus, walk to yard, and then get signed on.").) Another employee declared that the practice was encouraged in training. (Aguilera Decl. ¶ 5.)

Additionally, Plaintiff asserts that scheduled meal breaks are automatically deducted from a driver's work time based on the pre-loaded schedule and the exception form only applies if the driver does not have at least a 30-minute meal break. (Doc. No. 46-1 at 11; *see also* Doc. No. 50 at 85 (Defendant's exception form).) Thus, when the scheduled meal break exceeds 30 minutes and the driver is delayed but still takes a 30-minute meal break, the exception form would not apply so the driver is not compensated for the time worked in excess of the pre-loaded schedule. (Doc. No. 46-1 at 11; *see also* Puente Decl. ¶ 7 ("When my meal was scheduled for longer than 30 minutes, and I was late to the meal break but still got a 30 minute meal break, I was not told to call dispatch or file an exception form. But my scheduled meal break was always deducted from my time worked."); Lovejoy Decl. ¶ 5 (same); Flores Decl. ¶ 7 (same); Dominguez Decl. ¶ 7 (same); Jordan Dec. ¶ 6 (same); Murrillo Decl. ¶ 7 (same); Moore Decl. ¶ 7 (same); Brazelton Decl. ¶ 7 (same); Aguilera Decl. ¶ 6 (same); Fletcher Decl. ¶ 8 ("I believe scheduled meal periods are automatically deducted from my hours worked. When my scheduled lunch periods are more than 30 minutes (for an example scheduled for a full hour), and I got a full 30 minutes break, I was not told to call in to dispatch or to file an exception form even if I was late arriving to my break."); Armstead Decl. ¶ 6 (same); Cook Decl. ¶ 7 ("Also, I would regularly be late for my meal breaks. But, if my scheduled meal break was longer than the minimum 30 minutes, and I got a full 30 minute break, I was not told to call that in to dispatch or file an exception form. But, the time I spend driving while late to my meal break was still deducted from my hours worked.").

In opposition of certifying Plaintiff's off-the-clock claims, Defendant asserts that its uniform policy is that "[b]oth Transdev's dispatchers and operators are tasked with

monitoring the operators' actual work time for the day and ensuring that the operators' time in VDS is adjusted to reflect the operators' actual time worked." (Doc. No. 58 at 6.) As a result, Plaintiff's alleged violations "hinge[] on an employees' [sic] alleged exercise of their own discretion or prerogative to not follow the company's policy" and thus "the legality of the policy as implemented is, by definition, not common to all members of a putative class who work at multiple different locations and whose time is tracked by multiple different dispatchers." (*Id.* at 7.) Moreover, Defendant argues that "Plaintiff relies exclusively on anecdotal evidence from a handful of putative class members . . . that is squarely contradicted by both deposition testimony and declarations of other putative class members[.]" (*Id.*) Due to this "conflicting evidence," Defendant asserts individualized inquiries will predominate. (*Id.* 7–8 (citing *Reed v. Cnty. of Orange*, 266 F.R.D. 446, 450 (C.D. Cal. 2010).)

Defendant relies on *Reed* for the proposition that a "disparity between putative class members' testimony about pre-shift and post-shift activities 'results in highly individualized questions of fact that make proceeding as a collective action impractical and prejudicial to the parties.'" (*Id.*) However, Defendant's reliance on *Reed* is misplaced. In *Reed*, the district court found that the employees "might be assigned any number of job assignments, all with different responsibilities," across 100 separate work locations, resulting in "wide variation" of pre-shift and post-shift activities. *Reed*, 266 F.R.D. at 450–53. Here, every declaration of putative class members submitted by Defendant expressly attest to the same pre-trip and post-trip inspections as those attested to in the declaration Plaintiff submitted. (*See* Doc. No. 58-4 at 4–5, Declaration of Joaquin Moreno, "Moreno Decl.", ¶ 11 (pre-trip inspection), ¶ 12 (post-trip inspection); Doc. No. 58-4 at 7–10, Declaration of Rigoberto Muratalla, "Muratalla Decl.", ¶¶ 20–22 (pre- and post-trip inspections); Doc. No. 58-4 at 12–14, Declaration of Salvador Medina, Medina Decl., ¶ 9 (pre-trip inspection), ¶ 10 (post-trip inspection); Doc. No. 58-4 at 16–18, Declaration of Maurice Z. Williams, Jr., "Williams Decl.", ¶ 15 (pre-trip inspection), ¶ 16 (post-trip inspection); Doc. No. 58-4 at 20–22, Declaration of Brendan Ramirez, "Ramirez Decl.", ¶

9 (pre-trip inspection), ¶ 12 (post-trip inspection); Doc. No. 58-4 at 24–26, Declaration of Timothy William Donegan, "Donegan Decl.", ¶¶ 15–16 (pre-trip inspection), ¶ 17 (post-trip inspection); Doc. No. 58-4 at 29–31, Declaration of Scott Lundberg, "Lundberg Decl.", ¶ 8 (pre-trip inspection), ¶ 10 (post-trip inspection); Doc. No. 58-4 at 33–35, Declaration of Nichole Wesley, "Wesley Decl.", ¶ 7 (transport to the yard), 10 (post-trip inspection); Doc. No. 58-4 at 37–39, Declaration of Tamika Scott, "Scott Decl.", ¶ 18 (pre-trip inspection), ¶ 9 (post-trip inspection).) In fact, the exact requirements of the pre-trip inspection are delineated in the Bus Operator's Daily Defect Sheet. (*See* Doc. No. 46-3 at 6.) In this regard, the Court finds the evidence proffered by both parties does not conflict. *See Arredondo v. Delano Farms Co.*, 301 F.R.D. 493, 523 (E.D. Cal. 2014) ("The Court finds very little variance in the type of work the declarants stated they performed prior to the shift. The vast majority say they were either setting up or attending school. Regardless, the common question presented is whether uncompensated pre-shift was being performed. The particular task being performed is irrelevant to potential liability under California law. So too is the worker's motive for working prior to the shift.").

To the extent the declarations proffered by Defendant generally aver that they complete the pre-trip inspection on-the-clock bears on the common question of whether Defendant had an informal policy of discouraging operators from clocking in prior to completing the pre-trip inspection. *See Jones v. Farmers Ins. Exch.*, 221 Cal. App. 4th 986, 996 (2013), *as modified on denial of reh'g* (Nov. 26, 2013) ("Farmers argued in opposition to the class certification motion that it had no uniform policy denying compensation for preshift work and that individual issues predominated . . . . It filed declarations by APD claims representatives and others stating generally that they were not required to perform unpaid preshift work[ and] that they requested and received approval to work overtime if necessary . . . . Farmers's evidence concerns the existence of a uniform policy denying compensation for preshift work, which is a common question amenable to class treatment, as we have stated."). Resolution of this common question "will drive resolution of prong one" of Plaintiff's off-the-clock claim. *See Jimenez*, 765 F.3d at 1165–66.

The Court notes that the declarations proffered by Defendant are much narrower in geographic and temporal scope than those submitted by Plaintiff. Plaintiff provides declarations from nineteen operators, who span thirteen locations, from 2018 to 2024. (*See generally* Doc. Nos. 46-3; 46-4.) The declarants put forth by Defendant are predominately from one location—Arcadia—with two from Modesto and one from Napa, and, with the exception of two, only reflect the time period from 2021 to 2024.[3] (*See generally* Doc. No. 58-4.) It is unclear from Defendant's declarants whether they report running late into the lunch break if the 30-minute meal break is not impacted; however, the only declarant to expressly address the situation states she was unsure what to do. *See* Wesley Decl. ¶ 15 ("I am not sure what exactly is supposed to happen if you return from the run late before your break. I know that if you get back late, you tell dispatch and they start your meal break late so you still get paid.") Additionally, it is clear that many of Defendant's declarants had similar experiences with shifts running long based on tightness of Defendant's scheduling. (*See, e.g.*, Medina Decl. ¶ 16 ("On a daily basis, I am late to return to the yard and end my shift due to my current schedule."), ¶ 20 ("I regularly work later than my shift is scheduled to end because of traffic, accidents, detours, construction and other factors that delay your arrival."); Williams Decl. ¶ 10 ("Depending on the 'paddle,' which is the schedule of the route, I can run late and miss my scheduled lunch breaks or breaks. When that happens to me, I let dispatch know so that I can get paid for that missed time. I understand this is called a Wage 9 penalty."); Scott Decl. ¶ 13–14 ("Routes do run late so we end up not being able to take a full 30 minute break. . . . We do end up taking short breaks or missing breaks if we are running late.").) Moreover, Defendant's declarants also clearly attest that the onus for accurate timekeeping is placed on employees. (*See* Lundberg Decl. ¶ 11 ("A lot of the timekeeping is our responsibility because we are responsible for tracking our time

---

[3]     Additionally, one of those nine declarations includes inconsistent statements that undermine its credibility. (*Compare* Ramirez Decl. ¶ 16 ("I don't keep track of my time or pay because I do this job because I love it, not because of financial necessity.") *with* ¶ 20 ("I keep careful track of my time, so I know that I am paid for all of my time.").)

correctly. Transdev's system does not link driver time to the buses, so if a drive gets back from their route late, that information is not logged in the system. The drivers need to notify Transdev that they returned late and then make a note so there is a paper trail.").)

Although Defendant attempts to recharacterize Plaintiff's theory as that of a "rogue dispatcher" who fails to adjust operator time, the key issues to the class are whether Defendant creates a scheduling policy that systematically requires operators to work hours in excess of their schedules and whether putting the onus on employees for routinely correcting their hours violates Defendant's responsibility for accurately recording its employees' hours. *See Rai v. Santa Clara Valley Transp. Auth.*, 308 F.R.D. 245, 262–63 (N.D. Cal. 2015) (finding that "whether [the transportation authority's] scheduling policy systematically requires operators to incur routinely late time" to be "central to the determination of whether the class members are entitled to compensation for routinely late time" despite a policy against off-the-clock work and the possibility "that individual operators may decide not to submit extra time reports for unique reasons"); *Arredondo*, 301 F.R.D. at 524 ("The warning of the employees does not relieve the employer of the duty to pay for the pre-shift work."); *see also Donohue v. AMN Servs., LLC*, 11 Cal. 5th 58, 75 (2021) (quoting *Brinker Rest. Corp. v. Super. Ct.*, 53 Cal. 4th 1004, 1053 n.1 (2012) (Werdegar, J. concurring)) (reiterating that the burden for accurate recording falls to the employer because "[t]o place the burden elsewhere would offer an employer an incentive to avoid its recording duty and a potential windfall from the failure to record meal periods[,]" an approach rejected by "[b]oth the United States Supreme Court and the courts of this state"). Moreover, based on the declarations proffered by Plaintiff from across thirteen locations, there is sufficient evidence to support that Defendant's dispatchers either consistently fail to enforce its alleged policies against off-the-clock work or there is a policy-to-violate-the-policy. *See Arredondo*, 301 F.R.D. at 518.

In light of the prevailing nature of the common questions identified above, Defendant's assertion that individualized inquiries predominate is unpersuasive. *See, e.g.*, *Rai*, 308 F.R.D. at 263; *Stitt v. S.F. Mun. Transp. Agency*, No. 12-CV-3704 YGR, 2014

23-cv-00380-AJB-MMP

WL 1760623, at *5, *9–10 (N.D. Cal. May 2, 2014) (finding common questions to predominate where the bus and train operator plaintiffs alleged the defendant's "method for scheduling runs systematically underestimates run times and virtually guarantees that Operators work overtime" including the common question of "whether [the d]efendant's policies and procedures relating to submission of overtime cards amount to a 'policy to violate the policy'"). Accordingly, the Court finds that Plaintiff has demonstrated commonality and predominance for her off-the-clock, overtime, and double-time claim.

### 2.    Split Shift Wage Claim

Plaintiff's second cause of action asserts that Defendant consistently requires putative class members to work morning and afternoon or evening shifts split by two or more hours off but fails to pay split-shift premiums. (Compl. ¶¶ 81–84; *see also id.* ¶¶ 34–37.) In support of certification, Plaintiff asserts that "whether Transdev has a common policy and practice of not paying split-shift premiums to drivers who worked split shifts" is a common question that predominates and is capable of a common answer. (Doc. No. 46-1 at 17, 27 n.24.) Further, Plaintiff provides twelve schedules that included split shifts and expert testimony that 15% of the total class sample shifts provided by Defendant constitute split shifts. (Doc. Nos. 46-5, Declaration of Heather H. Xitco, "Xitco Decl.", ¶ 11; 63 at 125–37.)

Pursuant to California Industrial Welfare Commission Order No. 9-2001, as codified, "[w]hen an employee works a split shift, one (1) hour's pay at the minimum wage shall be paid in addition to the minimum wage for that workday, except when the employee resides at the place of employment."[4] Cal. Code Regs. tit. 8, § 11090(4)(C).

Defendant argues that Plaintiff fails to demonstrate commonality and predominance because its split shift premium policy is compliant with California law. (*See* Doc. No. 58

---

[4]    "'Split shift' means a work schedule, which is interrupted by non-paid non-working periods established by the employer, other than bona fide rest or meal periods." Cal. Code Regs. tit. 8, § 11090(2)(N).

at 13.) However, Defendant's argument goes to the merits, not class certification, and thus are appropriately made at the summary judgment or trial stage. *See Jimenez*, 765 F.3d at 1166 n.5. The key question—whether Defendant's interpretation and resulting policy is compliant with California law—predominates. *See Kamar v. RadioShack Corp.*, 254 F.R.D. 387, 405 (C.D. Cal. 2008), *aff'd sub nom. Kamar v. RadioShack Corp.*, 375 F. App'x 734 (9th Cir. 2010) (finding that the exact same "legal dispute militate[d] in favor of class certification, since it must be resolved for the class as a whole"). Whether individual class members were underpaid as a result of that policy can be determined on an individual basis using Defendant's records. *See Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (finding that "[t]he amount of damages is invariably an individual question" in "nearly all wage-and-hour class actions" and "does not defeat class action treatment"). Accordingly, the Court finds that Plaintiff has demonstrated commonality and predominance for her split shift claim.

### 3.    Meal and Rest Break Claims

Plaintiff's third and fourth claims assert violations of meal and rest break requirements in violation of California Labor Code §§ 226.7 and 512. (Compl. ¶¶ 85–90, 91–95.) Regarding meal breaks, Plaintiff asserts that the operators' scheduled meal breaks as shown on the paddles are pre-loaded as non-work time into the VDS, so they are automatically deducted unless operators alert dispatch and submit an exception form. (Doc. No. 46-1 at 11.) However, Defendant has not produced a document showing that such a policy was communicated to drivers, and Defendant's employee manual does not provide any rest or meal break policy. (Doc. No. 46-1 at 11.) Due to the tight "aspirational[]" scheduling and traffic, operators are regularly late to meal breaks.[5] With regard to rest

---

[5]    (Doc. No. 46-1 at 11; *see also* Lovejoy Decl. ¶ 8 ("I drove routes in which I regularly could not take my meal breaks. This happens because I am regularly late on the route and cannot get a full 30 minutes of break time after transferring the bus to a new driver, before I have to drive again."); Bourque Decl. ¶ 12; Puente Decl. ¶ 11 (same); Garza Decl. ¶ 10 (same); Flores Decl. ¶ 11 (same); Smith Decl. ¶ 11 (same); Armstead Decl. ¶ 10 (same); Rodriguez Decl. ¶ 11 (same); Cook Decl. ¶11 (same); Dominguez Decl. ¶ 11 (same); Bustamante Decl. ¶ 9 (same); Molleson Decl. ¶ 9 (same); Jordan Decl. ¶ 10 (same);

breaks, Plaintiff's theory of liability is that the rest breaks, which Defendant calls "opportunity breaks," are "to allow drivers to re-synch with the schedule," and only if the operator is running on time can it be taken as a rest break; however, operators regularly were unable to take rest breaks because the route was running late.[6] Additionally, Plaintiff asserts that scheduling the breaks for exactly ten minutes is in practice a violation because operators cannot leave the bus if there are passengers inside and clearing the bus of passengers takes time, so that there is not enough time to both clear the bus and take the off-duty rest break.[7]

///

---

Moore Decl. ¶ 11  (same); Murillo Decl. ¶ 11 (same); Aguilera Decl. ¶ 10 (same); LaPlant Decl. ¶ 9 ("[M]eal breaks were regularly not take[n] for paratransit drivers. This is for the same reason that rest breaks were not taken—we were given a schedule with specific pick-up locations and times and drop of[f] locations and times for individuals. These schedules were very difficult to conform too, and we could not simply fail to pick up passengers. There was never enough time to have a full 30 minutes with no passengers on the vehicle to break.").)

[6]      (Doc. No. 46-1 at 12; Lovejoy Decl. ¶ 6; *see also* Fletcher Decl. ¶ 10 ("I believe I did not get a full 10 minute rest break most days I drove as a bus driver for Transdev."); Bourque Decl. ¶ 10 (same); Armstead Decl. ¶ 8 (same); Bustamante Decl. ¶ 7 (same); Moore Decl. ¶ 9 (same); Brazelton Decl. ¶ 9 (same); LaPlant Decl. ¶ 7 ("While I worked for Transdev, rest breaks were not possible for paratransit drivers."); Flores Decl. ¶ 9 (estimating missing an average of sixty percent of rest breaks per week); Smith Decl. ¶ 9 (estimating missing an average of 8 rest breaks per week); Rodriguez Decl. ¶ 9 (estimating missing rest breaks six days a week); Molleson Decl. ¶ 7 (estimating missing an average of 5–6 rest breaks per week); Puente Decl ¶ 9 (estimating missing an average of 4–5 rest breaks per week); Garza Decl. ¶ 8 (same); Aguilera Decl. ¶ 8 (estimating missing an average of 4 rest breaks per week); Dominguez Decl. ¶ 9 (estimating missing an average of 3–4 rest breaks per week); Murillo Decl. ¶ 9 (estimating missing an average of 3 rest breaks per week); Jordan Decl. ¶ 11 (estimating missing an average of 2–3 rest breaks per week); Cook Decl. ¶ 9 (estimating missing rest breaks twice a week).)

[7]      (Doc. No. 46-1 at 13; Lovejoy Decl. ¶ 6; *see also* Flores Decl. ¶ 8 ("I drove routes in which I could not take ten minute rest breaks. This is because the rest breaks were opportunity breaks, many of which were only scheduled for 10 minutes. I was not allowed to leave the bus to take a break with passenger on the bus. There was not enough time to clear the bus and take rest breaks. Additionally, it is often the case that I was late on my route and could not even stop for the opportunity break."); Fletcher Decl. ¶ 9 (same); Puente Decl. ¶ 8 (same); Garza Decl. ¶ 7 (same); Smith Decl. ¶ 8 (same); Armstead Decl. ¶ 7 (same); Rodriguez Decl. ¶ 8 (same); Cook Decl. ¶ 8 (same); Dominguez Decl. ¶ 8 (same); Bustamante Decl. ¶ 6 (same); Molleson Decl. ¶ 6 (same); Moore Decl. ¶ 8 (same); Murillo Decl. ¶ 8 (same); Brazelton Decl. ¶ 8 (same); Aguilera Decl. ¶ 7 (same); Lovejoy Decl. ¶ 6 (same); LaPlant Decl. ¶ 7 ("While I worked for Transdev, rest breaks were not possible for paratransit drivers. This is because we were given an extremely tight schedule in which there was not time to clear our vehicle, and take 10 minutes uninterrupted break.").)

In support of certification, Plaintiff asserts that common questions predominate, including "whether Transdev has a common practice of providing noncompliant meal and rest breaks," "whether Transdev has a common practice of not paying drivers meal and rest break premiums when compliant meal and/or rest breaks are not provided," and "whether Transdev fails to relinquish control over drivers due to its policy and practice of prohibiting drivers from taking rest breaks unless and until the bus is cleared of all passengers." (Doc. No. 46-1 at 17.) Further, of the sample data Defendant provided, Plaintiff's expert identified 43,007 instances where no meal break was recorded within a 5-hour shift (12% of total shifts), 5,207 instances when meal breaks were less than 30 minutes (1% of total shifts), 33,276 instances of unpaid wage premiums (9% of total shifts), and 887 instances where no second meal break was reported for shifts over 10 hours. (Xitco Decl. ¶¶ 14, 16, 18.)

Under California law, an employer must provide meal and rest periods in accordance with applicable statutes, regulations, and wage orders of the Industrial Welfare Commission ("IWC"). Cal. Lab. Code § 226.7(b). Pursuant to IWC's wage order governing the transportation industry, "[n]o employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes[.]" IWC Wage Order 9-2001 § 11(A); *see also* Cal. Lab. Code § 512(a) (same). "The employer satisfies this obligation if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so." *Brinker Rest. Corp.*, 53 Cal. 4th at 1040; *cf. Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625, 638 (S.D. Cal. 2010) ("An illusory meal period, where the employer effectively prevents an employee from having an uninterrupted meal period, does not satisfy this requirement."). Additionally, "[e]very employer shall authorize and permit all employees to take rest periods . . . at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof" based on the total hours worked daily. IWC Wage Order 9-2001 § 12(A). "If an employer fails to provide an employee a meal or rest or recovery period in accordance with a state law, . . .

the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the meal or rest or recovery period is not provided." Cal. Lab. Code § 226.7(c).

Plaintiff has proffered sufficient evidence that common questions predominate, including whether Defendant's system of preloading meal breaks and requiring operators to submit exception forms when a meal break is short or missed violates California law, whether scheduling tight breaks in light of practical considerations of traffic and clearing of buses fails to fulfill Defendant's obligation to provide uninterrupted breaks where it relieves its employees of all duty, and whether Defendant failed to implement in writing or otherwise communicate a meal and rest break policy to its employees. *See Moreno v. JCT Logistics, Inc.*, No. EDCV172489JGBKKX, 2019 WL 3858999, at *16 (C.D. Cal. May 29, 2019) ("The issue of whether the schedules imposed on drivers permitted them to take meal breaks can be addressed on a classwide basis, for example, from testimony of JCT personnel regarding the schedules assigned for each route. . . . If the schedules assigned for particular routes were so tight that the driver could not take meal breaks, Defendants effectively denied breaks to the drivers, regardless of any meal break policies carriers might have established for drivers they hired. Thus, questions common to the entire class predominate the meal break claim."); *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 609 (N.D. Cal. 2014) ("The meal and rest break claims also are susceptible to common proof. . . . Plaintiffs rely, in part on Exel's lack of a policy to permit meal and rest breaks, which itself is an issue susceptible to common proof. Plaintiffs also point to companywide practices with respect to scheduling of deliveries that they contend make it difficult or impossible for drivers to take breaks. These issues can be effectively addressed on a class-wide basis.") (internal citation omitted); *see also Bond. v. Ferguson Enters., Inc.*, No. 1:09-CV-01662, 2011 WL 284962, at *5 (E.D. Cal. Jan. 25, 2011) (finding "[w]hether Defendant automatically deducted thirty minutes worth of working time on the basis of the unverified assumption that truck drivers always took a half-hour, off-duty meal break and *in lieu* of keeping contemporaneous or accurate meal break records" to be a "common

question[] of law or fact shared by all prospective class members" sufficient to fulfill commonality at the settlement approval stage pre-certification).

In opposition, Defendant asserts that Plaintiff "does not even attempt to allege that [Defendant] has a noncompliant meal and rest break policy," but instead that "Plaintiff acknowledges that meal and rest breaks are built into operator paddles," so it is simply that Plaintiff disagrees with Defendant's terminology. (*See* Doc. No. 58 at 8.) However, Defendant seems to obtusely misapprehend Plaintiff's arguments. Plaintiff is not arguing that the language Defendant uses makes the breaks noncompliant but rather the language supports Plaintiff's theory that operators are not permitted to take the breaks unless their route is on time, which often is not the case.[8]

Additionally, Defendant asserts that individualized issues such as "alleged inability to take compliant breaks due to route variances and expectations that a driver will meet certain time thresholds," "whether or not operators were informed of th[e exception form] protocol," and "why a particular penalty was paid or not paid," predominate. (Doc. No. 58 at 9–10.) However, based on Plaintiff's theory of liability, the first two questions would be capable of resolution based on proof of a uniform practice of impractical scheduling, lack of written policies, and informal policy and practice as testified to by operators and dispatchers. The possibility that Plaintiff will fail to prove her theory of liability does not undermine the sufficiency of evidence supporting certification at this moment. *See Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975) ("[N]either the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining

---

[8]     Some of the case law Defendant relies upon is similarly disconnected from the legal and factual circumstances of this case. For instance, Defendant cites to cases where plaintiffs attempt to prove a common practice of forcing employees to take short or late meal breaks solely by evidence of a common practice of not paying wage premiums. *See Coleman v. Jenny Craig, Inc.*, 649 F. App'x 387, 388–89 (9th Cir. 2016); *Vvanti v. O'Reilly Auto Enters., LLC*, No. 219CV02407WLHJPR, 2023 WL 4445531, at *5–*8 (C.D. Cal. July 10, 2023); *Ugas v. H & R Block Enters., LLC*, No. CV 09-6510 CAS SHX, 2012 WL 5230297, at *4 (C.D. Cal. July 9, 2012). That is not the case here.

to certify a class which apparently satisfies the Rule.").

Defendant asserts that it has presented sufficient conflicting testimony to undermine Plaintiff's showing of commonality and predominance. (Doc. No. 58 at 8 (citing *Gonzalez v. Millard Mall Servs., Inc.*, 281 F.R.D. 455, 463 (S.D. Cal. 2012)), 10.) However, Defendant's reliance on *Gonzalez* is unavailing. In *Gonzalez*, the defendants provided over 200 declarations from putative class members disputing the plaintiffs' claims, while the plaintiffs only provided 112 questionnaires which included responses from individuals who would be excluded from the class due to settlement of an unrelated union grievance and responses that were internally inconsistent. *Gonzalez*, 281 F.R.D. at 463. Here, Defendant provides less than half number of declarations Plaintiff has and from less than a fourth of the locations. In further contrast, the declarations proffered by Defendant actually support Plaintiff's contention that meal breaks are missed, due in part to Defendant's scheduling. (*See* Moreno Decl. ¶ 7 ("If I am late for my meal break, I let dispatch know."); Medina Decl. ¶ 13 ("On instances where I am running late to take my lunch due to detours, traffic, passenger delays, or other issues, I push a button on my monitor to let Transdev know."); Ramirez Decl. ¶ ("I know I have the option to call dispatch and ask for a lunch adjustment if I miss my lunch break. At times, I am late but I don't say anything because I will get breaks later and it doesn't make a difference to me.").) In fact, one declarant identified that there is a route for which the operator is never relieved of duty. (Scott Decl. ¶ 12 ("There is one route where you take your meal break at the Turlock Transit Center. For that route, we always get a Wage Order 9 payment for the lunch break, because you end up sitting on the bus and are not able to leave the bus, and passengers sometimes knock at the door.").) As such, these declarations further support that common questions regarding Defendant's scheduling practices predominate. *See Jaimez v. Daiohs USA, Inc.*, 181 Cal. App. 4th 1286, 1304 (2010) ("In addition, on their face, the declarations fail to establish that any of the meal breaks were: (1) uninterrupted, (2) for 30 continuous minutes, or (3) provided within the first five hours of a shift. First Choice's practices are the predominant common factual issues on the meal and rest break claims.").

Similarly, the declarations filed by Defendant also demonstrate a pattern of rest break violations. (Williams Decl. ¶ 11 ("I miss my short, ten to fifteen minute breaks all the time."); Moreno Decl. ¶ 8 ("On my current paddle, I often miss my last 10-minute break of the day. I sometimes make up the break anyway and then leave my last route late. Due to traffic, it causes me to return to the yard even later and I was paid for the entirety of that time."); Scott Decl. ¶ 14 ("We do end up taking short breaks or missing breaks if we are running late."); Muratalla Decl. ¶¶ 14–15 ("Depending on the route, traffic, construction, and outside factors, sometimes I miss my 10-minute rest break. . . . At times, I may miss my 10-minute break but I don't say anything because there are days where I get additional, paid breaks that were not accounted for in my schedule so I feel like it balances itself out."); Medina Decl. ¶ 14 ("I don't [report] when I miss my short rest breaks due to traffic, detours, or other issues because I feel as though I receive extra breaks in other parts of my day and the breaks balance out."); Donegan Decl. ¶ 10 ("At times, I may miss my 10-minute break but I don't say anything because there are days where I get additional, paid breaks so I feel it is fair and balances out.").) The fact that some declarants assert that there are other unscheduled moments of down time does not undermine the predominating question of whether the scheduling systems and policies Defendant has in place fulfill its obligation to provide legally compliant rest breaks.[9]

Finally, Defendant asserts that individualized issues will predominate with regard to Plaintiff's meal and rest break claims because bus operators in California are subject to various Collective Bargaining Agreements ("CBAs") that contain provisions governing such breaks. (Doc. No. 58 at 11.) However, as noted by Plaintiff (*see* Doc. No. 59 at 12), Defendant does not cite to specific language in any of the CBAs, identify what the alleged individualized inquiries would be, or explain how the alleged individualized inquiries

---

[9]    In final comparison, like the plaintiff's evidence in *Gonzalez*, one declaration of the nine submitted by Defendant is internally inconsistent. (*Compare* Ramirez Decl. ¶ 16 ("I don't keep track of my time or pay because I do this job because I love it, not because of financial necessity.") *with* ¶ 20 ("I keep careful track of my time, so I know that I am paid for all of my time.").)

would predominate. (*See* Doc. No. 58 at 11.)

Thus, there is sufficient evidence regarding Defendant's "actual business practices," including declarations proffered by both parties, to "support[] a finding that common questions would predominate" regarding Plaintiff's meal and rest break claims. *See Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 965 (9th Cir. 2013); *see also Meek*, 562 F. Supp. 3d at 500 ("[T]he declarations filed by both sides show a pattern and practice of rest break violations across the proposed class. . . . [T]he declarations on SkyWest's side are consistent on the point that rest breaks were not regularly provided and were subject to operational needs . . . .").

### 4.   Accurate Itemized Wage Statement Claim

Plaintiff's fifth cause of action asserts Defendant violated the California Labor Code by failing to provide accurate itemized wage statements. (Compl. ¶¶ 96–106.) In the instant motion, Plaintiff further asserts that this claim includes the common question of "whether Transdev's wage statements comply with Labor Code § 226(a) in light of the underlying violations" of the Labor Code. (Doc. No. 46-1 at 17.)

Defendant asserts that Plaintiff's wage statement claim is not subject to class treatment because it is "purely derivative of Plaintiff's 'off-the-clock' work, meal and rest break and split shift premium claims." (Doc. No. 58 at 14.) Although Plaintiff does not counter this point, Defendant is incorrect. Most of the allegations regarding Plaintiff's fifth cause of action *are* derivative of the other claims, but Plaintiff additionally alleges that "[e]ach wage statement failed to identify Defendants' legal name, 'U.S. HealthWorks, Inc.' This violation applies to all California Employees." (Compl. ¶ 99.) In support of this cause of action, Plaintiff proffers a single earning statement. (Doc. Nos. 49 at 141 (sealed); 50 at 99 (public).) If wage statements issued by Defendant follow a uniform format, then they could serve as a common form of proof of the presence or absence of Defendant's full legal name and address. *See, e.g.*, *Ward v. United Airlines, Inc.*, No. C 15-02309 WHA, 2016 WL 1161504, at *2 (N.D. Cal. Mar. 23, 2016).

However, Plaintiff neither asserts nor provides evidence demonstrating that

Defendant issues uniform wage statements for all operators across all locations. *See Valencia v. VF Outdoor, LLC*, No. 1:20-CV-01795-ADA-SKO, 2022 WL 4397084, at *14–15 (E.D. Cal. Sept. 23, 2022), *report and recommendation adopted*, 2022 WL 17343864 (E.D. Cal. Nov. 30, 2022) ("[H]ere, Plaintiff did not provide wage statements from employees from distribution centers other than Visalia. There is no testimony or any other evidence showing that Defendant uses a standard wage statement form to pay all of its employees. The Court thus lacks any basis to conclude that Defendant issued uniform wage statements across all four California distribution centers."); *cf. Sarviss v. Gen. Dynamics Info. Tech., Inc.*, 663 F. Supp. 2d 883, 908–09 (C.D. Cal. 2009) ("Although the Court does not doubt that it makes *sense* for [the defendant] to have a common payroll system for California employees, Plaintiff's declaration and arguments standing alone would not be sufficient (as common factual issues) to support the certification of such a broad class in the face of [the d]efendants' submissions showing that different employees were subject to different payroll systems because of the mergers and the existence of legacy employees.").

Based on the lack of information provided by Plaintiff, the Court cannot conclude that individualized issued do not predominate with regard to Plaintiff's wage statement claim.[10] Accordingly, the Court **DENIES without prejudice** Plaintiff's motion with regard to the fifth cause of action.

### 5.    Remaining Derivative Claims

Plaintiff's remaining claims are derivative of the previous claims. (*See* Compl. ¶¶ 96–106 (failure to provide accurate itemized wage statements), 107–12 (failure to pay

---

[10]    However, the Court notes that Plaintiff's expert Heather H. Xitco avers that damages could be calculated by "quantify[ing] the number of violations each employee incurred per pay period[] and determine the amount of penalties associated with accurate itemized wage statements" (Xitco Decl. ¶ 19). The Court thus agrees that, if Plaintiff were to have asserted and demonstrated Defendant issues uniform wage statements, then Plaintiff would likely be able to demonstrate that the common questions are capable of class-wide proof, thus meeting both the commonality and predominance requirements. *See Olean Wholesale Grocery Coop.*, 31 F.4th at 667; *see also Dukes*, 564 U.S. at 350.

wages due upon termination), 113–21 (violation of Unfair Competition Law), 122–27 (conversion).)

As Defendant notes, certification of these claims rise and fall with certification of the underlying claims. (Doc. No. 58 at 14.) Because the Court has determined that Plaintiff's labor code violation claims are suitable for class treatment, the derivative claims are also suitable for class treatment. *See Norris-Wilson v. Delta-T Grp., Inc.*, 270 F.R.D. 596, 611 (S.D. Cal. 2010) ("Because the Court has found that some of those claims can be resolved on a class-wide basis—the overtime compensation claim, for example—the unfair business practices claim can also be so resolved.").

However, the sixth cause of action is brought solely on behalf of former employees while the class for certification includes "[a]ll current and former" employees. The over-inclusivity of the class definition with regard to this claim undermines commonality and predominance. *See Castillo v. Bank of Am.*, NA, 980 F.3d 723, 730 (9th Cir. 2020) (quoting *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136 (9th Cir. 2016)) ("If many class members have no claim whatsoever because they 'were never exposed to the challenged conduct to begin with,' the class does not satisfy Rule 23(b)(3)."); *see also Perez v. Leprino Foods Co.*, No. 117CV00686AWIBAM, 2021 WL 53068, at *13 (E.D. Cal. Jan. 6, 2021) ("[W]hile commonality is satisfied, a subclass is needed for the separation wages class claim given that the relevant Labor Code provisions (§§ 201–203) will not apply to putative class members who have been continuously employed by [Defendant] throughout the proposed class period."). Due to this over-inclusivity and the lack of a request from Plaintiff to create an appropriate subclass, the Court **DENIES without prejudice** Plaintiff's motion with regard to the sixth cause of action.

### D. Superiority

Having found commonality and predominance met with regard to Plaintiff's first, second, third, fourth, seventh and eighth causes of action, the Court continues its analysis by turning to the superiority prong of Rule 23(b)(3).

If a court finds that the proposed class satisfies the predominance requirement of

Rule 23(b)(3), the court must also determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R. Civ. P. 23(b)(3). To determine superiority, courts consider (1) the interest of class members individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability of concentrating the litigation of the claims in this particular forum; and (4) the manageability of the action as a class. Fed. R. Civ. P. 23(b)(3)(A)–(D). Consistent with the aim of the Federal Rules of Civil Procedure to promote judicial economy, a class action is the superior method for resolution "[w]here classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Cartier-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

Plaintiff maintains that a class action is a superior method of adjudicating putative class members' claims against Defendant. (Doc. No. 46-1 at 31–32.) Though light on analysis, Plaintiff asserts that "one trial resolving all claims, instead of hundreds of trials, is superior" and that a class-wide action would be manageable because "[d]amages will be assessed based on Transdev's own time and pay records." (*Id.*)

Defendant does not dispute superiority. (*See generally* Doc. No. 58.)

There is no indication that the putative class members have brought related litigation against Defendant or have any interest in asserting these claims on an individual basis. *See Walter v. Leprino Foods Co.*, 670 F. Supp. 3d 1035, 1061 (E.D. Cal. 2023) (finding superiority because, "as it often is in wage-and-hour lawsuits, . . . the individual damages of each employee are too small to make litigation costs effective") (citation omitted). Regarding manageability, these claims are well-suited for class adjudication through use of schedules, policies, data and records in Defendant's possession as common sources of proof. *See Shaw v. AMN Healthcare, Inc.*, 326 F.R.D. 247, 274–75 (N.D. Cal. 2018).

Considering the applicability of the four superiority factors and Defendant's lack of any argument to the contrary, the Court finds that a class action would be the superior method of resolving the claims that Plaintiff alleges against Defendant.

## IV.    CONCLUSION

Based on the foregoing, the Court **GRANTS** Plaintiff's motion as to the first, second, third, fourth, seventh and eighth causes of action. The Court certifies the following class pursuant to Rule 23(b)(3):

> All current and former California Bus Driver/Operator employees of Transdev Services, Inc. who drove routes with stops in California during the period from February 27, 2019 through the present ("Class Period").

The Court appoints named Plaintiff Cherisha Lovejoy as class representative and appoints Hewgill Cobb & Lockard, APC and Schonbrun Seplow Harris Hoffman & Zeldes, LLP to serve as class counsel.

The Court **DENIES without prejudice** Plaintiff's motion as to the fifth and sixth causes of action. If so desired, Plaintiff may file a renewed motion for class certification as to those causes of action **no later than <u>August 25, 2025</u>**.

**IT IS SO ORDERED.**

Dated:  August 11, 2025

Hon. Anthony J. Battaglia
United States District Judge

23-cv-00380-AJB-MMP